## STOREY v. KNAPP et.

Common Pleas Court, Hamilton County.

No. 136432.   Decided August 25, 1949.

Charles P. Taft, Cincinnati, for complainants.
Walter K. Sibbald, Cincinnati, for defendants Hershberger and Green.
Robert F. Dreidame, Cincinnati, for defendant Marian Handel.

### ORAL OPINION

By BELL, J.

This lawsuit has been in this court and the Court of Appeals for a period of over forty years.   The suit was commenced in 1907, at which time this court took over the operation of this school.   Whether the person appointed to administer the affairs of the institution at that time was called a receiver or a business manager is not, in our opinion, highly important.   The court did administer this institution, and it was there declared and decided that this was a public, charitable Trust.   An election was held, and certain trustees were elected as a result of that original hearing.

Some twenty years later the matter was again brought to the attention of the court, and at that time the court appointed three trustees, and ordered that each year a report by those trustees of the financial position of this institution should

be filed with the court, but, as it appears in the record, that part of the Court's Order with regard to filing annual reports was not obeyed. That decision was taken to the Court of Appeals, wherein, so far as the right of the court to appoint the trustees and to make the Order, the judgment was affirmed. That decision of the Court of Appeals became the law of this case. There is no question at this time as to the right or jurisdiction of this court with reference to the appointment of trustees in the effort to save this institution.

After another period of about twenty years, in 1947, the matter again came to the attention of the court. The court still having continuing jurisdiction, a complaint was made by the Superintendent of the Division of Securities of the State of Ohio that this institution was violating the laws of the state. The court then, of its own motion, appointed auditors to determine the financial situation and to report to the court its findings. That was done. It is quite apparent that this court was dissatisfied with the conduct of the then trustees, Rev. Meredith Standley, Bessie Standley, and Mrs. Knapp. The Standleys resigned as trustees. Mrs. Knapp refused to resign and was removed by a judgment of this court. That judgment was appealed to the Court of Appeals, and, by affirming the judgment, the court again recognized the right of this court to appoint and to remove trustees.

Prior to the resignation of those two trustees and the removal of the third, this court saw fit to appoint a former judge of this court, define his powers by entry, and styled him a "Business Manager." We do not think that it is important whether he was called a "receiver" or a "business manager." His powers were those of a receiver. By this action of the court, the creditors' hands were tied. They had no right from July 6, 1948, and have no right now, to proceed to enforce any of their claims without going through the business manager, the trustees, and the permission of the court.

The asset here is the going institution, and the question, as we see it, is whether there has been an attempt made to destroy that asset. The court is firmly convinced that where a court takes over an institution for the purpose of straightening out its affairs, and paying off its creditors, that any one who attempts to destroy that asset may be guilty of contempt of court. We do not hold any brief for the conduct of this institution under the Standleys. It was in a muddled financial condition when the court, on July 6, 1948, took it over to straighten out its affairs and put it, if possible, on a sound financial basis. After the business manager was appointed,

he retained the Standleys as employees to do certain work under him at a stated compensation. That was the situation when the first of the documents complained of made its appearance. In passing, it might be noted here that one of the defendants, Hershberger, was an employee at the time the business manager was appointed, that he continued as an employee for some time thereafter, and that he did submit his resignation after it was suggested by the business manager that after his vacation he had better look for other employment.

This record discloses that as far back as the year 1945, the Division of Securities of the State of Ohio made what is called a "Cease and Desist Order," and by that Order this institution was ordered to cease and desist from certain practices in which it was engaged. The defendant Hershberger continued thereafter to do the very things that the Cease and Desist Order would not further permit had it been complied with, but he excuses his conduct on the basis that he was ordered so to do by the Standleys.

That brings us to the present situation. After the business manager had run the business for some little time, and after the Standleys resigned as trustees and Mrs. Knapp was removed, the court appointed five trustees of its own choosing. Included amongst those five was the business manager, and from that time until the present Judge Allen Roudebush has occupied a dual capacity, as business manager and trustee. After Hershberger resigned, he contacted one of the other defendants, Orville Green. The testimony shows that Orville Green had once been an employee of this institution. However, for many years he took no active part in the management of the institution until he became active in publishing the documents complained of.

This record discloses that Green was not a member of any of the churches connected with the "Holiness" movement. However, after the visit of Hershberger he became very active with Hershberger, and, on the stand, admitted a joint responsibility for these publications. The record discloses that the defendant Green is a brother-in-law of Mrs. Standley. He is also related by marriage to Mrs. Knapp. He is also related to one of the defendants, Mrs. Marian Handel.

As to the documents complained of, three of them were published anonymously. Three of them were published with the name of Green as editor.

In order to determine whether these defendants are guilty of contempt of this court, it is of course necessary to determine not only what they did but what was their intention

in doing it, and what was the highly probable result of their doing it. These publications disclose to a large number of the "Holiness" movement the information that the Standleys were removed by the court. That is untrue. The attack by these publications is not an attack upon the trustees appointed by the court, but is an attack upon the Standleys and, incidentally, an attack upon the business manager because in his wisdom he saw fit to continue the Standleys as his employees in the handling of this institution.

There can be no question that God's Bible School and Missionary Training Home could not exist for a period of six months in the absence of contributions by its friends, its admirers, and those engaged in the "Holiness" movement. One of these publications advises all of the people who came in contact with that publication that they should stop their contributions until they conferred with their ministers. That clearly shows an intention to stop the contributions and destroy the school. In addition to that, Hershberger in his testimony on the stand, took the position that it would be better to destroy this institution than to permit the Standleys to remain in the "Holiness" movement. In answer to one question he said that he knew that the effect of these publications, if the advice offered therein was followed, would be to stop the contributions to this institution.

Green, as the court has said, became very active after Hershberger no longer remained as an employee of the school. There has been no word of testimony of any activity upon the part of Green, nor any activity on the part of Hershberger, to attempt to right the claimed wrongs until after Hershberger left the institution. Green in his testimony, just before he left the stand, quoted the Holy Bible and gave that as an excuse. that his Bible taught him that he was to do these things. He also on the stand showed an utter disregard for what would happen to this institution if they could prevail in what they were attempting to do.

That presents the question of whether or not the right of free speech permits such conduct. In passing, it should be said that we were told a good deal about the amalgamation of church and state at the start of this case, but we have heard nothing further upon that subject and, in the opinion of the court, there is nothing here that has to do with the amalgation of church and state. In the first place, this is not a church. It is a school. In the second place, the books are full of cases where courts have taken over the affairs of the church when the rights of creditors become involved, and in no case of which we are advised has it ever been held

that such action was an amalgamation of church and state forbidden by the Constitution.

So that we are concerned here with the question of whether in the exercise of the freedom of the press or the freedom of speech these defendants have stepped beyond the bounds permitted. Freedom of speech and freedom of the press are practically the same thing. Freedom of speech is communicated by mouth. Freedom of the press is to communicate by a written document. Freedom of speech, nor freedom of the press, so far as we know, has never meant license to say and do as one pleases. In discussing freedom of speech, one of the great jurists of the Supreme Court of the United States, Mr. Justice Holmes, said in effect that freedom of speech did not mean that an individual could go into a crowded theater and shout "fire", and not be held answerable for his conduct. Many other examples could be given. Freedom of the press has never meant that the press was not to be held responsible for libel. Freedom of speech, in the opinion of this court, and there has been no case cited to the contrary, does not grant to any person the right to destroy or attempt to destroy an asset being administered by a court of justice and injure the creditors of that institution and then say, "We have a perfect right to destroy or attempt to destroy the asset under our liberty of freedom of speech."

We have concluded that all three of these defendants are guilty of contempt of this court. Hershberger and Green took the responsibility for the publication of these documents, which are in evidence. The opening statement of counsel for the other defendant was that she contributed documents and information which went into the publications. In addition to that opening statement, the evidence discloses some of her activity since the business manager and these trustees were appointed. She did not see fit to take the stand, and we are all quite familiar with the rule that the failure to take the witness stand in one's own defense may be considered by the triers of the facts in determining the guilt of the person so failing to take the stand. That rule applies to both civil and criminal cases.

As the court has said, we find all three of these defendants guilty of contempt of court, in that they wilfully, intentionally and maliciously published the documents complained of with the intention of destroying this institution, thereby destroying the asset belonging to the creditors.

We have not as yet determined what the punishment should be. When we have arrived at a conclusion as to what the punishment should be, all parties will be notified and brought

back into court. But we have agreed that the conduct of these defendants from this pronouncement of their guilt until the court does decide the appropriate punishment will be taken into consideration at that time.

MORROW, J. concurs.